Filed 10/13/23

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br>　　　Plaintiff and Respondent,<br>v.<br>JAMES PITTMAN,<br>　　　Defendant and Appellant. | A161815<br><br>(Contra Costa County<br>Super. Ct. No. 59334178) |

　　　James Pittman was sentenced to 15 years to life in prison for the second-degree murder of Joel Vigil in the early morning hours of July 4, 1993. Pittman was 21 years old at the time, and committed the crime with Charles Myers and Joshua Harvest, who were 16 and 17 years old, respectively. At a 2017 parole hearing, Pittman provided new inculpatory statements about the murder. Later, the trial court relied on Pittman's parole hearing testimony to conclude he was not entitled to relief under Penal Code section 1172.6,[1] which could have included vacatur of his conviction and resentencing. Pittman now appeals from the denial of his section 1172.6 petition.

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II and III.

　　[1] Undesignated statutory references are to the Penal Code. The parties' briefs and the trial court order refer to former section 1170.95, which was renumbered as of July 1, 2022 to section 1172.6. (Assem. Bill No. 200 (2021–2022 Reg. Sess.) (Stats. 2022, ch. 58, § 10).) For simplicity, we refer to section 1172.6.

Pittman contends that the trial court should have granted his petition for three reasons. First, he argues that it was improper for the trial court to admit and credit his parole hearing testimony, contending alternatively that parole hearings are unconstitutionally coercive, that use immunity applies to his testimony, or that the testimony was not reliable because it was adduced in that coercive setting. Second, he contends that the evidence presented at trial, along with his parole hearing testimony, was not sufficient to establish that he harbored the mental state necessary to convict him under any theory of murder that remains valid following recent legislative changes. Finally, in supplemental briefing, he argues that remand to the trial court is appropriate in light of new appellate authority that requires courts to consider how youth impacts a defendant's ability to form a sufficiently culpable mental state to support a felony murder conviction.

In the unpublished portion of this opinion, we conclude that Pittman's parole hearing testimony could be considered by the trial court and that all of the evidence, taken together, could constitute substantial evidence in support of the trial court's decision if there were no other circumstances warranting consideration. However, in the published portion of the opinion, we conclude that Pittman's youth is a relevant factor in assessing whether he formed the requisite mental state for conviction, which the trial court did not consider. Finding that the error is not harmless, we reverse and remand for further proceedings.

# BACKGROUND

## A. *The Evidence at Pittman's 1994 Trial*

### 1. *Myers' Testimony*

At trial, the bulk of the direct evidence of the crime came from Myers' testimony. Myers testified that he, Pittman, and Harvest were at Myers' house at night for a party. All three were drunk.

Harvest suggested robbing a nearby store. Pittman stated he would get a gun from his house to commit the robbery; he left to get a gun, but returned without one. Myers did not think Pittman actually had a gun. When Pittman went to retrieve the gun, he saw a man, Vigil, parked in front of his house. The man was "shooting up dope with a prostitute in his truck."

Pittman regrouped with Myers and Harvest, described what he had seen, and said to them, "Let's go whip his ass," referring to Vigil. Myers assumed they "were going to fight Mr. Vigil," throw something at the truck, or chase Vigil off. Myers did not believe they were going to rob or kill Vigil, there was no plan to do so, and Pittman never said anything to that effect.

Pittman took one "chisel" from a bucket on a neighbor's porch and handed one each to Myers and Harvest. Myers testified that he thought the chisels were metal implements with one sharp cutting edge and one blunt end. Chisels in hand, Pittman, Harvest, and Myers started walking down the street toward the truck. Harvest then "t[ook] off running." As Myers rounded the corner, he observed Harvest open the door to Vigil's truck and start stabbing Vigil with the chisel.

Myers saw Harvest stab Vigil twice, then threw his chisel at the back of Vigil's truck, breaking the back window. Myers then saw Pittman, who was standing at Vigil's tailgate, throw his chisel at the back of the truck, but he did not see where it landed. Harvest was still at the open truck door. Myers

saw Vigil's head "go forward" in a "little nod" approximately two seconds after Pittman threw his chisel. Myers did not hear any impact, but assumed Pittman's chisel hit Vigil in the head.

A few seconds after Pittman threw his chisel, Myers observed Harvest, alone, pull Vigil out of the truck. Vigil did not appear conscious; he was not moving. Myers did not see any attack on Vigil outside the truck. Harvest yelled for them to put Vigil in the back of Vigil's truck. Myers observed Harvest holding Vigil's upper body and Pittman holding Vigil by the shoes or ankles, attempting to lift him.

Myers entered the truck and looked for the chisels. The cab light was on, and Myers could see "puncture holes" in the front windshield.

When Myers exited the truck, Vigil's body was in the gutter, near the sidewalk at the back of the truck. Myers ran up the street and back around the corner to his truck, with Pittman following. Pittman got into Myers' truck and drove away with Myers. Harvest drove away in Vigil's truck. A few minutes later, Myers saw Vigil's empty truck crashed on the street. As Myers and Pittman drove nearby, Harvest called to them. Pittman and Myers picked Harvest up, and all three drove back to Myers' house.

During interviews prior to trial, Myers reported that Pittman had stomped on Vigil's head outside the truck. Myers later explained that he did not actually observe Pittman stomp on Vigil's head, but that he had "heard it from somebody." In a different interview, Myers stated that Pittman told him that he had kicked Vigil; at trial, Myers denied that Pittman told him he had done so.

### 2. *Sergeant George Ward and Myers' Probation Officer*

After Myers testified, the prosecution called two officers who had previously interviewed Myers. The first, Sergeant George Ward, led the

4

murder investigation.  Myers reported to Ward that Pittman hit Vigil, but did not stomp or kick him.  Ward also testified that Myers stated he had not actually seen Pittman kick Vigil, but that Pittman told him he had done so, so Myers believed him.  Ward testified that Myers stated it was Harvest who pulled Vigil from the truck.  Myers also told Ward that Pittman did not actually assault Vigil; only Harvest did.

Myers' probation officer testified that Myers reported to him that after Vigil was pulled from the truck, Pittman stomped on his head.

### 3. *Pittman's Interview with Ward*

Portions of Pittman's July 7, 1993 videotaped interview with Ward were played for the jury.  Pittman told Ward he was drunk that night.  He had said he was going to his house to get a gun, but he did not have one.  When returning from his house, Pittman observed Vigil in his truck with a woman and believed Vigil was injecting heroin.

Harvest suggested they should beat up Vigil "and make him leave."  Harvest then "ran over [to the truck], opened the door and started stabbing [Vigil] in the head."

When Harvest was stabbing Vigil, Pittman and Myers were by the corner.  Pittman and Myers threw their spikes at the truck.  Harvest was stabbing Vigil and did not stop when they threw the spikes.  Pittman threw his spike, which hit a metal part of the rear window, and then hit the front windshield.  Vigil's body ended up on the ground outside the truck.

Myers and Pittman ran away, then returned to get Harvest, who was dragging Vigil's body toward the curb.  Pittman initially tried to help Harvest move Vigil, but he did not want to.  Myers stayed by the truck.  Pittman and Myers then ran away.  Pittman did not hit, stomp, or stab Vigil.

5

Harvest jumped in Vigil's truck and drove off. Myers and Pittman drove around looking for Harvest and saw Vigil's truck "wrecked." They found Harvest and picked him up. When they arrived back at Myers' house, Harvest had blood "[a]ll over him."

### 4. *Sarah Potter's Testimony*

Sarah Potter was 17 years old at the time she testified. She was Myers' girlfriend at the time of Vigil's murder and was at his house that night. Just before Pittman, Harvest, and Myers left the house, Pittman stated they wanted to go get in a fight or to hurt somebody. When they returned, Potter saw Pittman washing his socks; he said he had to wash them because there was blood on them. Pittman also said he should have been a baseball player because of the way he threw the spike that killed Vigil. Pittman stated he had kicked or stomped on Vigil because "he was still alive after he was out of the truck." Pittman and Harvest laughingly demonstrated how heavy Vigil was to lift and move.

### 5. *Tamara Culpepper's Testimony*

Tamara Culpepper was 17 years old and Pittman's girlfriend at the time of Vigil's murder. Her testimony was inconsistent at times, but she confirmed she was at Myers' house the night of Vigil's murder. Pittman was drinking along with others at the party. Pittman, Harvest, and Myers left late in the evening because Pittman needed diapers and Harvest needed more alcohol.

Culpepper testified that when Myers, Pittman, and Harvest returned, Harvest, who had blood on his hands, went into the bathroom. Harvest scrubbed "his whole body, hands, and face." Culpepper asked what had happened. Myers stated that Harvest "was beating up this guy." Pittman explained that he had thrown a rock or spike at Vigil's truck, that it had

6

ricocheted off a metal part of the truck and hit the front windshield, and that Harvest had pulled Vigil out of the truck and hit him.  Pittman and Myers ran away, but Harvest "wouldn't leave," and then "ended up" in Vigil's truck.

### 6.  *Dr. Peterson, Forensic Pathologist*

Dr. Peterson, a forensic pathologist for the county, testified as an expert regarding Vigil's death.  He testified that Vigil died from "penetrating head injuries."  The fatal group of wounds was located on the left side of Vigil's face, above his ear.  According to Peterson, "force must have been applied several times in that small area to produce the fatal injury."  Certain superficial "chop" injuries caused abrasions before death, while the deeper injuries would have caused death "in a matter of seconds."  Brain tissue found on the left side of Vigil's face had "exited through th[e] hole in [Vigil's] head."

Chop injuries on the front and side of Vigil's face were inflicted prior to his death.  Kicks could have caused the non-lethal injuries to Vigil's shoulder, cheek, nose, and forehead.  The sharp end of the larger of two chisels in evidence could have caused the lethal injuries, but the blunt injuries likely were not caused by any surface of the chisel.

Dr. Peterson and the doctor who completed the autopsy agreed that two small injuries to the right side of Vigil's face likely were not caused by a kick, although Dr. Peterson testified that a kick could have caused one of the injuries.  Some of the blunt injuries could have been caused by Vigil's head hitting the pavement or the inside of his truck.

The back of Vigil's head showed no signs of injury.

### 7.  *John Nelson, Criminalist*

John Nelson, criminalist for the sheriff's department, testified as an expert in blood spatter analysis and crime scene processing and

reconstruction. Nelson analyzed the crime scene, where he observed pools of blood, smears, spatters, drag marks, and bloody shoe prints from at least two individuals.

Two sets each of three blood spatter patterns indicated two separate sets of at least three blows to Vigil. Both sets of blows were delivered low to the ground and were consistent with kicking Vigil on the ground after he had already started bleeding. The second set of three blows resulted in blood splatter on the rear portion of Vigil's truck. The minimum number of blows that occurred outside the truck was six; Nelson could not determine a maximum number of blows.

At a minimum, two blows would have been inflicted inside the truck; Nelson could not determine a maximum number of blows. Nelson believed the attack began in the truck cab, after which Vigil was pulled from the cab leaving a large pool of blood. The first three blows were then delivered a distance away, and the second three blows in a third location near the truck's rear wheels. Vigil's body was then dragged behind the truck.

The window behind the driver's seat was broken, with pieces of glass remaining at the edges. There were "impact marks left by some tools" that hit "the rubber grommets surrounding th[e] window at the top above the broken area and another tool mark [was] left by an object which impacted the metal divider bar at the edge . . . of the broken window." The tools that caused the impact marks were consistent with the chisels presented at trial, including the powdery orange rust that may have been the same material that deposited upon impact with the front windshield. Nelson observed no injuries to the back of Vigil's head, either at the scene or during the autopsy.

Nelson did not believe all the stab wounds to Vigil happened inside the truck, but acknowledged that was possible. The brain tissue and hair on the

8

truck's exterior indicated that some of "the penetrating wounds of the scalp" occurred outside the vehicle. No brain tissue or hair fragments were found inside the truck. Nelson stated that the brain tissue on the truck's exterior was consistent "not so much [with] kicking but receiving blows." He could not rule out that a kick or a stab deposited the brain tissue, or distinguish between any blows inflicted by stabbing versus kicking.

The bloody shoeprints came from two different pairs of shoes. They were consistent with Harvest's and Pittman's shoes.

Most of the clothing Nelson analyzed did not appear to have been washed following the attack on Vigil. It appeared Pittman had cleaned blood off his shoes, which had small amounts of residual blood on them. That blood was consistent with kicking Vigil, but Nelson could not determine conclusively if Pittman had done so. One drop of blood was located on the rear of Pittman's shorts. Nelson also located a very small spot of blood on Myers' shoes, as well as contact blood stains on the inside front of Myers' pants. Two pairs of Harvest's shoes, along with his shirt, pants, and one sock had bloodstains.

## B. *Jury Instructions and Verdicts*

The jury was instructed on the natural and probable consequences theory of murder. The jury returned verdicts that Pittman was not guilty of first-degree murder but was guilty of second-degree murder; they did not specify the theory or theories they relied on to find Pittman guilty.

## C. *Parole Hearing*

In 2017, Pittman testified at a parole hearing. At the outset, the presiding commissioner of the Board of Parole Hearings (Board) admonished Pittman that he "d[id]n't need to make any admissions or discuss details of

the crime, um, that'll be up to you and your attorney whether you want to discuss it today. Okay?" Pittman responded, "Yes ma'am."

Pittman described his upbringing and family background, and the circumstances preceding the offense. When a commissioner commented on the "evolution" in Pittman's discussion, he explained that at the last hearing the commissioner "encouraged [him] to . . . get a better in depth understanding of [his] upbringing." A commissioner later noted that Pittman was "not even close to being this forthcoming last time" about his gang involvement.

Pittman then described the crime. That night, Harvest had said he wanted to rob a neighborhood market, so Pittman said he would go get a gun from his house. He never had a gun. As he walked toward his house, Pittman saw Vigil's truck drive by, then turn around. When he left his parents' house, Pittman saw the truck parked in a spot where people used drugs. A man and woman were in the truck and the woman was preparing to use drugs, which angered Pittman.

Pittman went back around the corner to where Harvest and Myers were parked in Myers' car and told them what was happening; he said "let's go . . . attack these guys. Get rid of them." He saw the chisels in a bucket in the neighbor's front yard, and he picked them up and handed one to everybody. There was no other discussion about the chisels or what Pittman, Harvest, or Myers would do with them, but Pittman knew Harvest had killed someone eight days before and "knew when [he] handed [Harvest] that weapon that he would use that on the individual in the truck."

Harvest ran up to the truck, "yanked the door open," and made "stabbing motions" in Vigil's face and head area. Pittman threw his chisel, which broke the back window. He then came around to the door, finding

Vigil slumped over the steering wheel. He and Harvest pulled Vigil out of the truck "[t]o continue the attack that was planned to go over there and do."

Once Vigil was out of the truck, Pittman "kicked him a couple of times" in the side of the head. He "wasn't aware that [Vigil] was already dead." Vigil was not conscious and blood was everywhere.

Myers and Pittman started to run away, but Harvest asked for help with Vigil. Pittman tried to drag Vigil with Harvest and then put him in the back of the truck, but they could not lift him. They left Vigil in the gutter.

All three started running away again, then Harvest went back, jumped in the truck, and drove it away. He crashed the truck a block away. Myers and Pittman drove around, saw the crashed truck, and heard Harvest yell. Harvest jumped in the truck and they drove over to Myer's house where Harvest, "covered in blood," cleaned up. Pittman stated that he did not have any blood on him after the attack, including on his shoes.

Pittman was drunk. He did not know Vigil was dead until the next day. Pittman knew that Harvest and Myers had both been involved in a prior murder.

Pittman took responsibility for the murder and taking Vigil's life. A commissioner asked Pittman why he spent so many years saying his only participation was dragging Vigil. Pittman explained: "It's finally taking full responsibility of my actions. I'm the one that brung what they were doing to the kids—to [Harvest] and [Myers]. I could have been the one that prevented this from happening and I didn't do that." Later he repeated, "I'm the one that's responsible for their family member being murdered."

A commissioner asked Pittman if his story would continue to change, and if not, why not. Pittman responded that his current testimony was "all [of] it," and that his testimony would not evolve further because, "from the

11

last hearing when [the commissioner] basically gave me the direction, I took that direction and . . . this is how it's all coming out. . . . [¶] . . . I took your words and respected them and . . . I applied myself."

Pittman again discussed his responsibility for murdering Vigil, and explained the plan had been to "go[] over there to attack him." Commissioners commented that the Board last denied parole because Pittman lacked credibility and minimized his crime. Later, Pittman's attorney commented that at the last hearing a commissioner told Pittman he had to be "all in or all out," and asked Pittman what he had decided. Pittman responded, "I'm all in." In closing, the commissioners commented approvingly that Pittman had been "forthright," had made "enormous changes," and that he was "definitely making huge strides" toward release.

Pittman and his attorney cited, and the Board considered, several issues related to his youth at the time of the crime.

**D.** *Resentencing Petition and Hearing*

In 2019, Pittman filed a petition for resentencing under section 1172.6. The court issued an order to show cause why Pittman should not be resentenced. With its briefing, the prosecution submitted a transcript of the 2017 parole hearing, and separately cited specific statements from the hearing. Over Pittman's objection, the court found certain excerpts from the transcript admissible.

At the resentencing hearing, Pittman called two experts to discuss the parole process. Neither was familiar with Pittman's case.

The first witness, Aly Tamboura, worked on criminal justice reform, including projects related to California's parole hearing process. He worked with the former secretary of the Department of Corrections on parole issues and also evaluated a Stanford University project that used an algorithm to

12

analyze parole hearing transcripts. Tamboura had read a cross-section of 375 parole transcripts and spoken with formerly incarcerated people about their experiences. The most important factor in the Board's assessment of parole suitability, according to Tamboura, is taking responsibility, also known as showing insight. At parole hearings, showing insight involves admitting the facts of the crime as "outlined in the [trial] court transcript." He explained that trial court records are treated as "gospel," and if the parole applicant disputes facts in the record, they are deemed to lack insight and "are usually not granted parole." Tamboura was not aware of a single instance where someone disputed the facts in the record and was paroled. He acknowledged that the Board also considers disciplinary history and plans for release in evaluating a person's suitability for parole.

The second expert, Heidi Rummel, testified that she had represented hundreds of people seeking parole as the director of a post-conviction justice legal clinic. Rummel agreed that the Board considers the parole applicant's personal accountability, remorse, and insight. She explained that the Board considers those factors, among others, to evaluate a person's current dangerousness, and thus their suitability for release. Other significant factors are institutional conduct and disciplinary history. Rummel agreed that "[i]t's very difficult to be granted parole for people who do not discuss the commitment offense" because otherwise "there's no way for someone to take personal accountability for the crime." If a person does not discuss the crime, they also cannot address insight and remorse. It is "very damaging" for a person to minimize their involvement, blame others, or otherwise not take full responsibility for the crime. According to Rummel, "[t]hat's a typical reason for a parole denial."

13

Rummel noted the "impossible choice" for prospective parolees: whether to admit inculpatory facts to secure parole or instead to protect their chances of obtaining other types of post-conviction relief. Rummel agreed that although it is very hard for an individual to secure release on parole if they minimize or do not discuss the crime, it is still possible. A third defense witness, an attorney, agreed by declaration that "incarcerated people who express remorse and take full responsibility for their convictions improve their chances of being granted parole."

The court denied Pittman's petition on December 28, 2020. Considering the jury's general guilty verdict, the court explained that one or more jurors may have concluded Pittman was guilty under the invalidated natural and probable consequences theory, and that it had to vacate Pittman's conviction "only where the sole evidentiary basis of [that conviction] involved a theory of liability [that is] no longer permitted." The court concluded that Pittman "acted as a principal who along with co-defendant Harvest personally killed Mr. Vigil while acting with express or implied malice. Alternatively, the court finds that . . . [Pittman] acted with malice aforethought as an aider and abettor of a principal (Harvest) who killed Mr. Vigil."

The court discussed the factual background, drawing on the trial evidence, and also noted, "[o]f particular significance," four of Pittman's statements at the parole hearing. The court explained that the statements were admissible hearsay as party opponent statements under Evidence Code section 1220. Although the court acknowledged "the difficulty that might be presented to any prospective parolee when considering whether" to discuss their "conviction at a parole hearing," "given the nature of the specific details

14

provided by [Pittman] to the parole board about this limited set of facts," it had "no doubt" that the testimony was credible.

The four portions of the transcript the court relied on were Pittman's testimony that: (1) Vigil "was pulled from the truck so that [Pittman] and Harvest could continue a 'planned attack' "; (2) Pittman "had supplied weapons (chisels) from a neighbor's yard to 'everybody' "; (3) "Harvest had murdered someone eight days before this crime and [Pittman] knew Harvest would use the weapon [Pittman gave him] to kill [Vigil]"; and (4) "[a]fter [Vigil] had been attacked and pulled from the truck, [Pittman] kicked him a couple of times in the side of his head as [Pittman] was not aware that [Vigil] was already dead."

The court ultimately found that Pittman had distributed the chisels or spikes to the three young men; thrown a chisel or spike at Vigil through the back window of his truck; kicked Vigil in the head; and acted with the implicit intent to kill and knowing that Harvest intended to kill Vigil. Even without the parole statements, the court stated, "the evidence established beyond a reasonable doubt the malice aforethought necessary to prove the crime" and that "[a]t the very least, the evidence show[ed] [Pittman] was acting with conscious disregard for human life," "a form of implied malice."

## DISCUSSION

### I. *Section 1172.6 and Principles of Implied Malice Murder*

Section 1172.6 allows individuals to petition for relief if they were convicted of murder under theories invalidated by Senate Bill 1437. (See § 1172.6, subd. (a)(1)–(3); Stats. 2018, ch. 1015, §§ 1, 2, 3.) With the enactment of Senate Bill 1437, the Legislature abolished the natural and probable consequences doctrine of murder liability. (*People v. Gentile* (2020) 10 Cal.5th 830, 842–843, superseded by statute on other grounds as stated in

15

*People v. Wilson* (2023) 14 Cal.5th 839, 869; see § 188, subd. (a)(3).) Once the petitioner meets certain procedural conditions set forth in section 1172.6, the trial court holds a hearing where "the burden of proof [is] on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . under California law as amended by [Senate Bill 1437's] changes to Section 188 or 189." (§ 1172.6, subd. (d)(3); *People v. Oliver* (2023) 90 Cal.App.5th 466, 477 (*Oliver*).)

At the hearing, a court "may consider evidence previously admitted at any prior hearing or trial that is admissible under current law [and] new or additional evidence" offered by either party. (§ 1172.6, subd. (d)(3).)

We must consider whether Pittman can now be found guilty of murder. The parties focus on the "essential question" whether Pittman harbored implied malice during the crime. To guide our analysis, we outline the standards applicable to our evaluation of the trial court's ruling at Pittman's section 1172.6 hearing.

### a. Standard of Review

We review the trial court's decision denying Pittman's petition for substantial evidence. (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*); *People v. Sifuentes* (2022) 83 Cal.App.5th 217, 232–233.) "In reviewing the trial court's findings for substantial evidence, we . . . ' " 'examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the necessary fact] beyond a reasonable doubt.' " . . . While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence,

16

contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt.' " (*Oliver*, *supra*, 90 Cal.App.5th 466 at p. 480.) "[S]ufficiency determinations necessarily take account of the 'standard of proof that applied before the trial court.' " (*People v. Renteria* (2022) 13 Cal.5th 951, 970.)

### b. Aiding and Abetting Implied Malice Murder

Pittman was convicted of second-degree murder, which is " 'the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507 (*Cravens*).) Malice aforethought "may be express or implied." (§ 188, subd. (a).) Implied malice exists "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (*Id.*, subd. (a)(2).) "Murder is committed with implied malice when 'the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " ' [Citation.] ' "To be considered the proximate cause of the victim's death, the defendant's act must have been a substantial factor contributing to the result, rather than insignificant or merely theoretical." ' " (*Reyes*, *supra*, 14 Cal.5th at p. 988.) "The question of implied malice is to be decided in light of all the circumstances." (*People v. Moore* (2010) 187 Cal.App.4th 937, 942.)

The trial court concluded that Pittman was guilty of implied malice murder either as a principal or as an aider and abettor. On appeal, the Attorney General makes no distinct argument that Pittman is guilty as a principal. The undisputed testimony at trial established that Harvest's

stabbing of Vigil alone caused his death within a matter of seconds; that Pittman's chisel did not strike Vigil; and that any kicks were not lethal. Even if Pittman's chisel struck Vigil in some way, that single blow could not have resulted in the group of lethal wounds in close proximity that caused Vigil's death, according to Dr. Peterson. While we consider any kicks inflicted by Pittman relevant to whether he harbored implied malice, we find scant evidence in the record supporting a theory that Pittman's actions proximately caused Vigil's death, as required to prove he was liable as a principal. (*Reyes*, *supra*, 14 Cal.5th at p. 988.) We therefore focus on aiding and abetting liability.

" '[D]irect aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea. [Citation.] In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act. For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act. . . . The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.' " (*Reyes*, *supra*, 14 Cal.5th at pp. 990–991.) The direct aider and abettor must, therefore, act with intent to aid the life-endangering act of the direct perpetrator that proximately causes the death. (*Id.* at pp. 991–992.)

To find him guilty of second-degree implied malice murder as an aider and abettor, the trial court was required to find that Pittman knew Harvest intended to attack Vigil, intended to aid Harvest in attacking Vigil, knew the

attack was dangerous to Vigil's life, and acted in conscious disregard of his life.

## II. *Admissibility of Parole Hearing Testimony*

Pittman challenges the trial court's consideration of his parole hearing testimony on three grounds. We review de novo his claims that the testimony should be excluded as involuntary and that he should have been granted immunity for that testimony. (See *People v. Vasila* (1995) 38 Cal.App.4th 865, 874–876 (*Vasila*); *People v. Anderson* (2022) 78 Cal.App.5th 81, 89–93 (*Anderson*).) We review the trial court's ruling on the admissibility of the testimony for abuse of discretion. (*People v. Duran* (2022) 84 Cal.App.5th 920, 927–928 (*Duran*).) "[A] court abuses its discretion when it misapprehends the pertinent law." (*Id.* at p. 928.)

### a. Involuntariness

Pittman argues that because of the coercive nature of parole hearings in general, as well as the specific circumstances of his 2017 parole hearing, the trial court should have excluded his parole testimony as involuntary. Pittman points to the expert testimony at his resentencing hearing that parole applicants are very rarely granted parole if they do not maximize their responsibility for the crime and show "insight" by admitting to the facts in the trial court record. Pittman also notes the Board members' comments regarding the differences between his 2017 parole hearing testimony and that in prior hearings. In sum, Pittman argues that "[w]hen he testified at his 2017 parole hearing, [he] understood that the Board expected a full confession in exchange for his release on parole."

In determining whether a confession is involuntary, we ask whether (1) the defendant was promised leniency, and (2) that promise was " 'a motivating cause of the decision to confess.' " (*Vasila, supra,* 38 Cal.App.4th

at p. 873.)  If a government agent merely encourages a person to tell the truth and does not promise "some benefit beyond that which ordinarily results from being truthful," the confession is not involuntary.  (*Id.*, at p. 874.)

Regulations describe the information the Board can gather from a parole applicant, stating: "The facts of the crime shall be discussed with the prisoner to assist in determining the extent of personal culpability.  The board shall not require an admission of guilt to any crime for which the prisoner was committed.  A prisoner may refuse to discuss the facts of the crime in which instance a decision shall be made based on the other information available and the refusal shall not be held against the prisoner." (Cal. Code Regs., tit. 15, § 2236; see also § 5011, subd. (b).)  The regulations also cite remorse as a factor indicating suitability for parole—but do so along with eight other factors.  (Cal. Code Regs., tit. 15, § 2281, subd. (d).)  The regulatory scheme, therefore, does not require parole applicants to discuss and admit the facts of their crime to be deemed eligible for release.

And although the expert testimony was mixed, two of Pittman's experts acknowledged that a person can be released on parole without discussing their crime.  Two experts also agreed that other factors—including institutional behavior, disciplinary infractions, and plans for release—play a significant role in the Board's evaluation of parole suitability.  (See Cal. Code Regs., tit. 15, § 2281, subds. (c)(6), (d)(8), (d)(9).)

With respect to Pittman's hearing in particular, the Board did not promise leniency in exchange for his incriminating testimony.  At most, Board members in the past had encouraged Pittman to tell the truth, and then expressed approval when he did so at the 2017 hearing.  Pittman was represented by an attorney, and the Board admonished him at the outset that

20

he was not required to discuss details of the crime or admit guilt.  Consistent with the regulatory scheme, the Board encouraged Pittman to delve broadly into his background to develop better insight into all the circumstances that led to the crime (see Cal. Code Regs., tit. 15, § 2281, subd. (b)), rather than simply parrot facts from the trial record.

The circumstances in *Vasila* and *People v. Gonzalez* (2012) 210 Cal.App.4th 875—the two cases Pittman presents as analogous here—are readily distinguishable.  In both cases, the defendants were offered concrete promises in exchange for their incriminating statements.  (See *Vasila*, *supra*, 38 Cal.App.4th at pp. 874, 877 [confession involuntary where officers told defendant they would charge him with federal crimes and not release him if he refused to tell them where he had hidden firearms]; *Gonzalez*, at pp. 881, 884 [statement by parole agent that if defendant did not agree to speak with officers, parole agent would be forced to recommend that defendant serve maximum time in custody, knowing defendant feared returning to prison, rendered defendant's confession involuntary].)  Board members here did not promise Pittman release in exchange for his admitting additional or particular facts.  They noted his "forthcoming" answers and discussion not only of the crime, but also the contributory factors in his background.  The Board, having advised Pittman of his rights, merely encouraged him to provide further truthful testimony.  (*Vasila*, at p. 874.)

Pittman's parole testimony was not involuntary.

### b. Immunity

Pittman next contends that section 1172.6 petitioners should receive immunity for their testimony at parole hearings because otherwise they are forced to choose between their right to be free from self-incrimination and the possibility that they might be released on parole.  The California Supreme

21

Court has held that criminal defendants should receive immunity for their testimony at probation revocation hearings, allowing them to object and courts to exclude such testimony from the prosecution's case in chief at a subsequent criminal trial. (*People v. Coleman* (1975) 13 Cal.3d 867, 889 (*Coleman*).) In such instances, the *Coleman* court concluded, the defendant should not be required to choose between the right to be heard at the revocation proceedings and the right to be free from self-incrimination. Such immunity, Pittman argues, should be extended to testimony provided during parole hearings to protect a defendant's rights and prevent the prosecution from gaining an unfair advantage.

This court, however, has held that *Coleman*-type immunity does not extend to the use of parole hearing testimony in section 1172.6 proceedings. (*Anderson, supra*, 78 Cal.App.5th at pp. 89–93; see also *People v. Myles* (2021) 69 Cal.App.5th 688, 704–706 [no immunity for statements made during parole hearing or parole risk assessment]; *People v. Duran, supra*, 84 Cal.App.5th at pp. 930–931 [no immunity for petitioner's statements made to psychologist during parole risk assessment interview]; *People v. Mitchell* (2022) 81 Cal.App.5th 575, 589 [no immunity for parole hearing testimony].) "Absent a compelling reason, the Courts of Appeal are normally loath to overrule prior decisions from another panel of the same undivided district or from the same division." (*Estate of Sapp* (2019) 36 Cal.App.5th 86, 109, fn. 9.) We find no compelling reason to do so here.

Our decision in *Anderson*, like the others noted above, distinguished *Coleman* on the ground that the privilege against self-incrimination does not attach to resentencing hearings under section 1172.6, so in this context defendants do not face the unfair choice between the exercise of two rights that gave rise to the *Coleman* rule. (*Anderson, supra*, 78 Cal.App.5th at

22

p. 93; see *Myles, supra*, 69 Cal.App.5th at p. 706; *Duran, supra*, 84 Cal.App.5th at pp. 929–931; *People v. Mitchell, supra*, 81 Cal.App.5th at p. 589.) Pittman argues that we were wrong to conclude that the Fifth Amendment does not apply. He points to *People v. Basler* (2022) 80 Cal.App.5th 46, 57–59, published shortly after *Anderson*, which found that a resentencing hearing under section 1172.6 is akin to a plenary sentencing hearing and a critical stage in the criminal process at which the defendant therefore has a Sixth Amendment right to be present. And he notes that *Basler* relied in part on the observation in *People v. Lewis* (2021) 11 Cal.5th 952, 973, that there is a due process right to the appointment of counsel in a habeas case after the issuance of an order to show cause, as well as in a Proposition 47 resentencing hearing after the defendant passes the eligibility stage. (*Basler*, at pp. 58–59.)

These cases do not establish that the privilege against self-incrimination applies to testimony regarding the offense of conviction at a resentencing hearing under section 1172.6. As we wrote in *Anderson*, "the United States Supreme Court has held that the Fifth Amendment applies through original sentencing, but has stated that incrimination is complete in cases in which the sentence has been fixed and the judgment of conviction has become final." (*Anderson, supra*, 78 Cal.App.5th at p. 93, citing *Mitchell v. United States* (1999) 526 U.S. 314, 324.) Relying on *Mitchell v. United States* to reach the same conclusion, the *Duran* court pointed out that a defendant's final judgment of conviction remains intact during the resentencing hearing, and is not vacated unless and until the prosecution

23

fails to sustain its burden of proof.  (*Duran, supra*, 84 Cal.App.5th at pp. 930–931.)[2]

Pittman points out that our Supreme Court has held that a habeas petitioner has the right to assert the privilege against self-incrimination if called as a witness in that proceeding, which he argues is analogous to a resentencing hearing.  (See *In re Scott* (2003) 29 Cal.4th 783, 815.)  But this argument fails to distinguish between two different things.  After holding that a habeas petitioner could not assert a privilege against being called as a witness (because the court concluded that the proceedings were "civil in nature for these purposes"), *Scott* then added that the petitioner has a right to invoke the privilege "as to individual questions, *as does any witness in any proceeding*."  (*Id.* at pp. 815–816, italics added.)  This latter aspect of the court's holding did not turn on a special characteristic of habeas proceedings. The court was merely applying the general rule that a witness in a criminal or civil proceeding may invoke the privilege against self-incrimination when the witness faces a risk of incrimination.  Even assuming that this rule also applies to a resentencing hearing under section 1172.6, the relevant point from *Mitchell v. United States* is that "where there can be no further incrimination, there is no basis for the assertion of the privilege."  (*Mitchell v. United States, supra*, 526 U.S. at p. 326; see *People v. Lopez* (1999)

---

[2] At oral argument, Pittman's counsel contended that a murder conviction is "presumptively invalid" once the petitioner makes a prima facie showing of entitlement to relief under section 1172.6, subdivision (c).  We can agree with this characterization to the extent it means that, upon such a showing, the prosecution bears the burden of proving beyond a reasonable doubt that the defendant is guilty of murder under a currently valid theory and the conviction will be vacated if the prosecution fails to carry its burden. But we do not agree with it insofar as it is intended to suggest that the conviction has already been vacated and the resentencing hearing is therefore equivalent to a new trial.

71 Cal.App.4th 1550, 1554 ["When a defendant has already pled guilty to a charge, and time to appeal the conviction has run without an appeal being filed, the defendant's privilege to avoid compelled self-incrimination with regard to the facts underlying the conviction no longer exists"].) Because the judgment of conviction remains intact during the resentencing hearing, the defendant does not have a basis to invoke the privilege *as to the facts underlying the conviction*; the defendant does not face "further incrimination" based on those facts. We see no indication that *Scott* considered this issue, and indeed, in a footnote the court wrote: "Because petitioner ultimately did not testify at the reference hearing, we do not consider any other issues that might arise regarding a testifying petitioner's possible invocation of the privilege against self-incrimination." (*Scott*, at p. 817, fn. 7.) As the Supreme Court has frequently observed, " ' " 'cases are not authority for propositions not considered.' " ' " (*Geiser v. Kuhns* (2022) 13 Cal.5th 1238, 1252.)

Pittman also argues that we should find the privilege applicable based on the enactment of Senate Bill No. 775 (2021–2022 Reg. Sess.), in which the Legislature "[r]eaffirm[ed] that the proper burden of proof at a resentencing hearing under this section is proof beyond a reasonable doubt," (Sen. Bill No. 775 (2021–2022 Reg. Sess.) § 1(c)) and amended (now) section 1172.6, subdivision (d)(3), to provide that the resentencing hearing is governed by the Evidence Code, subject to certain exceptions. Pittman contends that by referring to the Evidence Code, the Legislature necessarily included Evidence Code section 940, which codifies the privilege against self-incrimination. But that section provides: *"To the extent that such privilege exists under the Constitution of the United States or the State of California*, a person has a privilege to refuse to disclose any matter that may tend to incriminate him." (Italics added.) For the reasons discussed above, a person with a final

conviction does not have a constitutional privilege against self-incrimination as to the facts underlying that conviction.

With respect to the burden of proof, we acknowledge that in *People v. Mitchell, supra*, 81 Cal.App.5th 575, Presiding Justice Stratton argued in dissent that denying the defendant the privilege against self-incrimination lessened the prosecution's burden of proof, which she found inconsistent with the Legislature's express imposition of that burden on the People without qualification. (*Id.* at p. 604 (dis. opn. of Stratton, P. J.); cf. *Coleman, supra*, 13 Cal.3d at p. 876 ["The heavy burden thus placed upon the prosecution in a criminal trial to prove through its own investigation the guilt of the defendant may be substantially lightened if the prosecution is allowed to take advantage of the defendant's testimony at a prior probation revocation hearing"].) But that view did not persuade the majority, and the panel in *Duran* also disagreed with it. (See *Duran, supra*, 84 Cal.App.5th at p. 931.) As other courts have observed, notwithstanding the prosecution's burden of proof, "section 1172.6 remains a ' " ' resentencing procedure, not a new prosecution.' " ' " (*Estrada v. Superior Court* (2023) 93 Cal.App.5th 915, 924–925, quoting *People v. Flint* (2022) 75 Cal.App.5th 607, 618.) Of course, if the Legislature concludes that a different rule would better advance its intent in creating the resentencing remedy, it may amend the statute to provide use immunity for parole hearing testimony, or more generally, to allow the defendant to assert a privilege against self-incrimination as to the conviction at issue. But without more, we do not see a "compelling reason" to abandon our prior holding in *Anderson* that use immunity is not available for parole hearing testimony.

### c. Reliability

Pittman alternatively contends that the trial court should have excluded, or at least declined to credit, his parole testimony as unreliable hearsay. The trial court admitted Pittman's parole hearing testimony as a party admission under Evidence Code section 1220. "[T]he party-admission exception codified in Evidence Code section 1220, covers '[e]vidence of a statement . . . when offered against the declarant in an action to which he is a party . . . .'" (*People v. Flinner* (2020) 10 Cal.5th 686, 735.) "While 'sometimes referred to as the exception for admissions of a party,' Evidence Code section 1220 'covers all statements of a party, whether or not they might otherwise be characterized as admissions.'" (*People v. Gonzalez* (2021) 12 Cal.5th 367, 409.)

Pittman does not identify any case in which a party admission offered under Evidence Code section 1220 was excluded as unreliable, or was even subject to an evaluation for reliability prior to admission. "As reported in the Law Revision Commission Comment, the rationale of this exception to the hearsay rule is that the party's right to cross-examine the declarant is not violated since the party himself made the statement." (*People v. Alvarez* (1968) 268 Cal.App.2d 297, 305.) Pittman cites *People v. Earnest* (1975) 53 Cal.App.3d 734, 741, in which the court wrote that "the principal reason for all the exceptions to the hearsay rule"—and it expressly included Evidence Code section 1220 among them—"is that under certain circumstances hearsay statements are as reliable as statements made in court." However, the only requirements for admissibility under Evidence Code section 1220 are that (1) there is a statement of the declarant (2) offered against the declarant. (*People v. Gonzalez, supra*, 12 Cal.5th at p. 409.) Those minimal conditions were satisfied here.

Acknowledging that his statements "technically fell within the parameters of Evidence Code section 1220," Pittman argues that the trial court should not have relied on them because they were "not made under trustworthy circumstances." But while the trial court could properly consider Pittman's arguments that the statements should not be credited given the circumstances under which they were made, or because they were inconsistent with the forensic evidence, the testimony of other witnesses, or Pittman's own statements at previous parole hearings, our task on appeal is different. In conducting our review, we do not resolve credibility issues or evidentiary conflicts. (*People v. Owens* (2022) 78 Cal.App.5th 1015, 1022.) To be sure, under appropriate circumstances, we can find evidence so unreliable that it cannot constitute substantial evidence in support of the judgment. (See *People v. Del Rio* (2023) 94 Cal.App.5th 47, 57–59 [probation report could not sustain judgment where the People failed to demonstrate a substantial basis for believing the hearsay information it contained was reliable]; *In re Eugene M.* (1976) 55 Cal.App.3d 650, 659 [prior unsworn out-of-court statement, though admissible as a prior inconsistent statement, was not substantial evidence when "given by an apparent accomplice under threat of prosecution and thereafter repudiated under oath"].) However, for the reasons discussed above, Pittman's testimony not only was properly admitted, but the circumstances were not so inherently coercive or untrustworthy—and the statements were not so inherently unbelievable or contradictory—that no reasonable trier of fact could have credited them.

Accordingly, we conclude that the trial court properly admitted statements that Pittman made at his parole hearing, and that the weight to give them was for the trial court to decide.

28

## III. Substantial Evidence

As noted above, we must consider whether the record contains substantial evidence that Pittman knew Harvest intended to attack Vigil, intended to aid Harvest in attacking Vigil, knew the attack was dangerous to Vigil's life, and acted with conscious disregard for Vigil's life. (*Reyes*, *supra*, 14 Cal.5th at pp. 991–992.)

The evidence at trial showed that Pittman, angered by seeing Vigil "shooting up dope with a prostitute in his truck," picked up chisels in a bucket from his neighbor's porch, took one for himself, handed one each to Harvest and Myers, and said, "Let's go whip [Vigil's] ass." The chisels were metal instruments with one blunt end and a sharp cutting edge at the other end. Pittman, Harvest, and Myers all proceeded to Vigil's truck with the chisels. After Harvest ran ahead and while he was stabbing Vigil with his chisel, Pittman threw his chisel at the back of Vigil's truck. Once Vigil was on the ground, Pittman attempted to help Harvest pick up Vigil's body and put it into the back of the truck. Unsuccessful, Pittman, Harvest, and Myers all fled the scene, without rendering aid or otherwise demonstrating concern for Vigil's life. Pittman therefore supplied the deadly instruments to himself and his three codefendants, angrily instigated the attack on Vigil, participated in the attack, attempted to help Harvest move Vigil's body from the crime scene, and disregarded whether Vigil survived the attack. Pittman's parole hearing testimony gave further support to the trial court's finding that Pittman acted with implied malice. That testimony indicated that Pittman (1) knew Harvest had recently committed a murder; (2) knew Harvest intended to murder Vigil; (3) helped Harvest pull Vigil from the truck to continue the attack; and (4) kicked Vigil in the head "a couple times" because Vigil did not appear to be dead yet.

In large part, Pittman disputes the inferences the trial court drew from the evidence to conclude that he acted with conscious disregard for Vigil's life. Pittman argues that the direct evidence better supports a finding that Pittman intended only to assault Vigil. But " ' "[i]f the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*People v. Cravens*, *supra*, 53 Cal.4th at p. 508.) Here, the inferences the trial court drew from the evidence were reasonable. While Pittman's stated intention was to "whip [Vigil's] ass," he supplied the chisels to himself and his codefendants, knew that one of his codefendants had murdered someone else just days before, helped pull Vigil out of the truck to continue the attack, kicked Vigil in the head, and after the attack acted inconsistently with any concern for whether Vigil lived or died. All of these facts are consistent with an inference that Pittman acted with conscious disregard for Vigil's life.

Pittman also disputes whether his acts of distributing the chisels, instigating the attack, and/or throwing the chisel at the back window of Vigil's truck actually aided the murder. He takes issue with the trial court's reliance on "group beating" cases like *Cravens* and *People v. Guillen* (2014) 227 Cal.App.4th 934 (*Guillen*).[3] We agree with Pittman that *Guillen* and *Cravens* are insufficiently analogous to resolve the question of whether he acted with implied malice in these circumstances. In both *Guillen* and *Cravens* there was evidence that the defendants inflicted one or more direct blows on the victim that contributed in substantial part to their deaths. (*Cravens*, *supra*, 53 Cal.4th at pp. 508–511; *Guillen*, at pp. 985–988.) Their

[3] The trial court also relied on *People v. Garcia* (2020) 57 Cal.App.5th 100, but that case has since been depublished. (*People v. Garcia*, opn. ordered nonpub. Dec. 29, 2021, S265692.)

physical acts lent support to the courts' conclusions that each defendant subjectively appreciated the risk of death to the victim and consciously disregarded that risk. (*Cravens*, at p. 511; *Guillen*, at pp. 988–991.) Here, by contrast, the evidence indicates that Harvest alone inflicted the lethal blows on Vigil.

Nonetheless, the facts that Pittman instigated the attack on Vigil, supplied the chisels to himself and his codefendants, and joined the attack even without directly contributing to Vigil's lethal injury are sufficient to support the trial court's conclusion. For example, in *People v. Superior Court* (*Valenzuela*) (2021) 73 Cal.App.5th 485, 491, 493–494, 502–504, the court found sufficient evidence to support a charge of aiding and abetting second-degree implied malice murder where the defendant instigated and encouraged a group attack, joined the attack while armed with a weapon, targeted the victim, and knew his codefendant—who ultimately inflicted the fatal blow—was armed with a knife.

Thus, even without relying on *Guillen* and *Cravens*, we conclude that the record contains substantial evidence that could support the trial court's finding that Pittman is guilty as an aider and abettor of second-degree implied malice murder if there were no other relevant factors to consider. However, as discussed in the next section, youth is a relevant factor that the trial court did not consider, and we do not find the error harmless. (See *People v. Jones* (2022) 86 Cal.App.5th 1076, 1090–1091, 1093 [while substantial evidence might support the judgment if youth were not a relevant consideration, remand was appropriate where trial court failed to consider it].)

### IV. *Pittman's Youth*

We granted Pittman's request for supplemental briefing to address the role, if any, that youth should play in analyzing his petition.

#### a. Forfeiture

The Attorney General argues that we should not consider Pittman's arguments regarding his youth because his counsel did not raise the issue in the trial court. But we agree with the courts in *People v. Jones* (2022) 86 Cal.App.5th 1076, 1091 (*Jones*) and *Oliver*, *supra*, 90 Cal.App.5th at p. 488, that, given the timing of the cases deciding that youth is a relevant factor bearing on mental state in section 1172.6 petitions, " 'it is unlikely . . . that the trial court [or the parties] could have known to consider [Pittman's] age and maturity level, particularly to the extent now required by cases issued after the resentencing hearing.' " (*Oliver*, at p. 490.) The trial court issued its order on Pittman's petition in December 2020. The relevant appellate cases were not decided until 2021 or later. (See *People v. Harris* (2021) 60 Cal.App.5th 939, review dism. and remanded on other grounds September 28, 2022, S267802; *In re Moore* (2021) 68 Cal.App.5th 434; *People v. Ramirez* (2021) 71 Cal.App.5th 970; *In re Harper* (2022) 76 Cal.App.5th 450; *Jones*, *supra*, 86 Cal.App.5th 1076; *People v. Keel* (2022) 84 Cal.App.5th 546; *People v. Mitchell* (2022) 81 Cal.App.5th 575; *Oliver*, at p. 466.) We therefore exercise our discretion to consider the relevance of youth in this still-developing area of the law.[4] (*Oliver*, at p. 488.)

#### b. The Relevance of Youth

Pittman urges that his age—21—at the time of the attack is relevant to whether he acted with implied malice and therefore could be found guilty of

---

[4] Because we find no forfeiture, we do not address the issue of ineffective assistance of counsel.

second-degree murder at his resentencing hearing.  Recent appellate cases have concluded nearly uniformly that a defendant's youth—defined, roughly, as being 25 years of age and younger—is a factor within the totality of circumstances relevant to the requisite mental state for felony murder.  (See *People v. Harris, supra,* 60 Cal.App.5th at p. 960; *In re Moore, supra,* 68 Cal.App.5th at pp. 453–455; *People v. Ramirez, supra,* 71 Cal.App.5th at p. 987; *Jones, supra,* 86 Cal.App.5th at pp. 1091–1093; *People v. Keel, supra,* 84 Cal.App.5th at pp. 562–563; but see *In re Harper, supra,* 76 Cal.App.5th at p. 470 [assuming, without deciding, that youth may play a role in the analysis]; *Oliver, supra,* 90 Cal.App.5th at p. 490 [finding harmless any error in trial court's failure to consider defendant's age of 23 years]; *People v. Mitchell, supra,* 81 Cal.App.5th at p. 595 [discussing defendant's youth, but suggesting that consideration was more relevant to the question whether he should be released on parole].)

The policy interests underlying the felony murder cases—that youth is relevant to a criminal defendant's ability to perceive risk and consequences, and therefore to the level of culpability—apply equally in the context of implied malice murder.  The parties offer no reason *not* to include youth as a factor in the totality of the circumstances bearing on whether Pittman acted with implied malice.  And the implied malice mental state—conscious disregard for human life (*Reyes, supra,* 14 Cal.5th at p. 988)—is similar to the "reckless indifference to human life" standard applicable to felony murder.  (*In re Scoggins* (2020) 9 Cal.5th 667, 677.)  Indeed, the concept of reckless indifference to human life has a subjective component that expressly incorporates the "conscious[] disregard" of " 'the significant risk of death [the defendant's] actions create.' "  (*Ibid.*)  Given these similarities, and the lack of

any distinction supplied by the parties, we see no reason not to apply the principle articulated in the felony murder cases here.

The Attorney General concedes that youth *may* be a relevant factor in the totality of the circumstances relevant to Pittman's mental state, but argues that the trial court may have implicitly considered the issue; that this court is not *required* to remand to the trial court to consider Pittman's youth; and that any failure to consider Pittman's youth was harmless.

As the Attorney General notes, however, there was no discussion of Pittman's youth in the proceedings in the trial court, and the court did not mention the subject in its otherwise comprehensive ruling. We cannot, therefore, assume the trial court implicitly considered it. (See *Jones, supra,* 86 Cal.App.5th at p. 1092 [the trial court issued its decision omitting discussion of youth shortly after *People v. Harris* was decided, "without any remonstrance by defense counsel"].)

Because no evidence of youth was addressed in the trial court, we look to the felony murder cases to determine whether there is a reasonable possibility that the failure to consider Pittman's youth impacted the trial court's decision. (*Oliver, supra,* 90 Cal.App.5th at p. 489, fn. 8 [applying prejudice standard from *People v. Watson* (1956) 46 Cal.2d 818, 836].) "A 'reasonable probability' 'does not mean more likely than not, but merely a *reasonable chance,* more than an *abstract possibility.*' " (*People v. Hardy* (2021) 65 Cal.App.5th 312, 329–330.) The cases discussing the role of youth in relation to criminal culpability "stress two areas": youthful offenders' "relative impulsivity" and "their vulnerability to peer pressure." (*Oliver,* at p. 489.) " 'Transient rashness,' " " ' "impetuosity," ' " and " ' "failure to appreciate risks and consequences" ' " are hallmarks of an immature brain. (*Id.* at p. 490.) The circumstances of the offense here suggest that some of

34

these "hallmark features of youth" may have been at play. (*Id.* at pp. 486, 487; see also *In re Moore*, *supra*, 68 Cal.App.5th at p. 454.)

Pittman, 21, participated in the attack on Vigil with two peers who were 16 and 17 years old. Inferences of immaturity and peer pressure may be drawn from those facts. In addition, notwithstanding Pittman's characterization of the attack as "planned," the trial evidence indicates that Pittman and his peers acted impulsively and under the influence of "transient rashness." The selection of chisels as weapons appears to have been spontaneous. The acknowledged motivation for the crime was the happenstance that, while walking by his house, Pittman noticed Vigil "shooting up dope with a prostitute in his truck." Pittman argues on appeal that material characteristics of youth are exacerbated in certain situations like those here, citing Pittman and his codefendants' intoxication and "negative emotional arousal." We also note that issues surrounding youth were discussed at Pittman's parole hearing.

That Pittman was 21 years old at the time does not dissuade us. The defendant in *Jones* was 20 years old, and yet the court deemed remand warranted to consider his relative youth. (*Jones*, *supra*, 86 Cal.App.5th at pp. 1092–1093; cf. *Oliver*, *supra*, 90 Cal.App.5th at p. 489 ["Presumably, the presumption of immaturity weakens as a defendant approaches 26"].) We do not find further factual distinctions between this case and the felony murder cases sufficiently compelling to overcome "the interest[s] of justice" served by remand. (*Jones*, at p. 1093.)

We conclude, therefore, that Pittman's youth was a factor for the court to consider at his resentencing hearing, and that remand is appropriate for

the court to consider how, if at all, Pittman's youth impacted his ability to form the requisite mental state for second-degree murder.

## DISPOSITION

The judgment is reversed, and the matter is remanded to the trial court for further proceedings consistent with this opinion.

GOLDMAN, J.

WE CONCUR:

BROWN, P. J.
HIRAMOTO, J. *

---

* Judge of the Superior Court of California, County of Contra Costa, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

| | |
|---|---|
| Trial Court: | Contra Costa County Superior Court |
| Trial Judge: | Honorable Charles B. Burch, Judge |
| Counsel for Defendant and Appellant: | Mary K. McComb<br>State Public Defender<br>Jessie S. Hawk<br>Deputy State Public Defender |
| Counsel for Plaintiff and Respondent: | Rob Bonta<br>Attorney General<br>Lance E. Winters<br>Chief Assistant Attorney General<br>Jeffrey M. Laurence<br>Assistant Attorney General<br>Catherine A. Rivlin<br>Deputy Attorney General<br>Charlotte Woodfork<br>Deputy Attorney General |